**In re CAR–GILL, INC., Debtor.**

**Bankruptcy No. 90–13385S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 20, 1991.

Carol B. Eisenberg, Philadelphia, Pa., for debtor.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

W. Stanley Perry, Philadelphia, Pa., for Landlord.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

At issue in this voluntary Chapter 11 bankruptcy case involving a Debtor-tavern is the crucial question of whether the Debtor's landlord either waived or is estopped from asserting that the Debtor's failure to move to assume or reject its lease within 60 days of its bankruptcy filing, pursuant to 11 U.S.C. § 365(d)(4), is grounds for deeming the lease rejected and terminating the Debtor's tenancy. We find that, by not only accepting rent but also by allowing the Debtor to obtain financing to make and to proceed to make substantial improvements to the premises after advising this court that its motion to deem the lease rejected was settled amicably, the landlord has indeed waived invocation of the Debtor's failure to act within the 60–day period, and is equitably estopped from asserting the Debtor's failure to proceed in accordance with § 365(d)(4), as a basis to terminate the parties' lease.

### B. FACTUAL AND PROCEDURAL HISTORY

CAR–GILL, INC. ("the Debtor") operates the Olde Sproul Tavern ("the Premises") in a shopping center owned by OLDE SPROUL SHOPPING VILLAGE, L.P. ("the Landlord"), situated at 1170–74 Baltimore Pike, Springfield, Delaware County, Pennsylvania 19064. It filed the underlying bankruptcy case on August 16, 1990. The Debtor leased its place of business from the Landlord pursuant to a 10–year lease dated April 3, 1987 ("the Lease").

The Bankruptcy Code, at 11 U.S.C. § 365(d)(4), provides as follows:

(4) ... in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

Despite the terms of § 365(d)(4), the Debtor placed its retention of the Lease in jeopardy by failing to file a motion to assume or reject the Lease or to extend the time-period to do so within 60 days from its bankruptcy filing. The first pleading filed in this case relevant to the Lease was a Motion filed by the Landlord on October 25, 1990, "to Show Cause Why Debtor's Unexpired Lease Should Not Be Deemed Rejected or, in the Alternative, for Adequate Pro-

tection of Lease Premises" ("the Motion"). The Motion was listed for a hearing on November 21, 1990.

The Debtor never filed an Answer to the Motion. However, on November 19, 1990, it filed a Motion to approve a loan in the amount of $30,000 from one Joyce Staino, pursuant to 11 U.S.C. § 364(c) ("the Loan Motion"), in order to make certain renovations to the Premises to convert it from a restaurant/bar to an "evening lounge/'beef and ale' facility."[1] The Loan Motion was listed for a hearing on an expedited basis, after immediate notice to all interested parties, on December 5, 1990.

On November 21, 1990, the parties reported that the Motion in issue had been settled and that a Stipulation setting forth the terms of the settlement would be filed. Thereafter, on December 5, 1990, the Loan Motion was approved without opposition.

Meanwhile, after a status hearing of December 14, 1990, the Debtor was ordered to file a Plan of Reorganization and an accompanying Disclosure Statement by February 1, 1991. After a motion for an extension of this date to March 1, 1991, a hearing on the propriety of the Disclosure Statement filed is presently scheduled on March 27, 1991. Neither the Plan nor the Disclosure Statement makes any specific mention of the Landlord or the instant dispute. The only apparently relevant portion of the Plan is a provision that "[a]ll executory contracts of the Debtor not previously rejected pursuant to an Order of the Court shall be assumed."

The Stipulation which was to embody the settlement of the Motion never appeared. The court therefore scheduled a status hearing on February 13, 1991, to determine whether the Motion should be dismissed pursuant to Local Bankruptcy Rule 7041.2.[2]

Counsel appeared on February 13, 1991, and requested one further continuance to attempt to consummate the terms of the Stipulation. We granted that request, but listed the Motion for a final hearing on March 13, 1991.

The parties failed to present a Stipulation on March 13, 1991, contending that all of their differences had never been resolved. A hearing was conducted on March 13, 1991, on the merits of the Motion, at which Larry Shontz, a partner of the Landlord, and Tom Gillin, the principal of the Debtor, testified.

Shontz testified that the present monthly rental of the Debtor was about $4,000 under the Lease, computed as follows:

| | |
|---|---|
| Net Rent | $2,715.08 |
| Common Area Maintenance | 520.00 |
| Taxes | 725.00 |
| Advertising & Promotional Services | 12.50 |
| TOTAL | $3,972.58 |

He stated that, nevertheless, the Debtor had been consistently paying only $3,200 monthly rent to the Landlord post-petition, and had paid this sum for all but the current month of March, 1991. He also estimated the pre-petition rental arrearages to be $40,000.

It became apparent that the reason that the parties had never consummated the announced settlement was because they were attempting to establish terms under which the Debtor would cure rental defaults, pursuant to 11 U.S.C. § 365(b)(1)(A), but had widely disparate conceptions of what the rentals and the rent arrearages actually were or should be.

In support of his contention that the monthly rent was $3,200, the Debtor pro-

---

1. In exchange for the loan proceeds, Staino received a forty-nine (49%) percent interest in the Debtor. No "imminent terms for repayment" of the loan, apparently made without any written documentation or any charges for interest, were set forth.

2. This Rule provides as follows:

Settlement of Contested Matters and Settled Adversary Proceedings

Whenever, in any contested matter or adversary proceeding, counsel shall notify the clerk or the judge to whom the action is assigned that the issues between the parties have been settled, the parties shall file any necessary Stipulation and any requisite motion to compromise or settle, within thirty (30) days, or the matter shall be dismissed, unless a motion to extend the time, for cause shown, is filed within the thirty (30)–day period.

duced a member of letters to it from the Landlord and its counsel acknowledging payments of $3,200 without any reference to inadequacy of these remittances.[3] The Debtor also produced correspondence to it and its counsel which variously recited claims for pre-petition arrearages of $28,-104.08 and $37,110.05, respectively.[4] Shontz provided no convincing explanation for this discrepancy.

Gillin, however, presented no counter-analysis of the correct figures for the current monthly payment or for the pre-petition rental arrearages. He testified that he believed that he had been told that the monthly rent was $3,200 and he paid accordingly. Gillin claimed to have remitted a check in the amount of $3,200 to the Landlord for the March, 1991, rent on March 4, 1991. He rather naively testified to a plan to liquidate the pre-petition arrearages owed to the Landlord by making an "extra" $800 monthly payment, which would bring his total monthly payment to $4,000.[5]

The main issue raised by Gillin was his alleged advice to and the approval by Shontz of his planned financing and making of renovations to the Premises, without Shontz's having warned him that the Landlord would seek to terminate the Lease.

Gillin stated that making these renovations had, as anticipated, exhausted the $30,000 funds loaned from Staino. He also claimed, though without any documentary support, that, as a result of the renovations of the facility to a "beef and ale" lounge, his business had increased by seventy-five (75%) percent.

## C.  DISCUSSION

As Collier has observed, the 60-day time-limit of § 365(d)(4) "creates a substantial trap for the unwary." 2 COLLIER ON BANKRUPTCY, ¶ 365.03[3], at 365–32 n. 28b (15th ed.1990). We have previously recognized "that § 365(d)(4) is a harsh Code provision, requiring action by the Debtor in a brief period or subjection to the potentially disastrous consequences of loss of the lease of its place of business." *In re Boston Business Machines, Inc.*, 87 B.R. 867, 872 (Bankr.E.D.Pa.1988).

We have attempted to mitigate this harshness by interpreting § 365(d)(4) to require that a motion to extend the 60-day period need only be *filed* with the court rather than *granted* by the court within the 60-day period. *See In re Garrett Road Supermarket*, 89 B.R. 514, 519–20 (Bankr. E.D.Pa.1988), *aff'd*, 95 B.R. 902 (E.D.Pa. 1989). *See also In re Tulio*, 115 B.R. 75,

---

**3.**  Our own review of the rather confusing Lease (all pertinent terms seem to be included in a very lengthy "Rider"), while not intended to be a final decision on the issues, has resulted in the following analysis of the monthly rent due, which we include for the benefit of the parties in ultimately resolving their differences:

| | |
|---|---|
| Net Rent | $2,715.08 |
| Common Area Maintenance (3100 sq.' × 13½¢/sq. ft.) | 403.26 |
| Advertising & Promotional Services (3100 Sq.' × 4¢/sq. ft. ÷ 12) | 10.33 |
| TOTAL | $3,128.67 |

The main difference appears to be the treatment of the Debtor's liability for real estate taxes. We could not verify the accuracy of the Landlord's figures as to what the taxes were on the basis of any of the documents included in the record. Also unclear is whether the Debtor was obliged to advance a pro-rated amount towards taxes each month or whether it was contemplated that the Debtor would make a lump sum payment of its share of the taxes when the taxes came due. The Debtor appeared to have the

latter understanding, and hence did not remit these sums with the monthly rents.

**4.**  The difference in these figures is principally due to different recitations of real estate taxes due. We also note that, in both computations, a mind-boggling amount is claimed for late charges, *i.e.*, $5,859.53. It appears that, in computing this figure, the Landlord has compounded charges, a method of calculation of which we disapproved in *In re Jordan*, 91 B.R. 673, 678–81, 685–88 (Bankr.E.D.Pa.1988).

**5.**  In addition to observing that $4,000 is the amount which Shontz claimed was presently due for current rent alone, and Gillin's failure to explain how he was to pay the delinquencies for taxes, the naivete of this statement is revealed by noting that payments in this amount, even assuming the low figure of $28,000 of arrearages, would consume almost 36 months to effect a cure. Very few cases have allowed the "prompt" cure required under § 365(b)(1)(A) to extend for more than a year. *See In re Gold Standard at Penn, Inc.*, 75 B.R. 669, 674 (Bankr. E.D.Pa.1987), and cases collected therein.

77 (Bankr.E.D.Pa.1990) (landlord that failed to plead § 365(d)(4) in § 362(d) motion precluded from arguing its pertinence to same).[6]

However, the Debtor here has subjected itself to the harsh consequences of § 365(d)(4) by failing to so much as *file* a motion to assume or reject the Lease or to seek additional time to do so, although it is now seven months since its bankruptcy filing. The Debtor is therefore obliged to attempt to fall back on three arguments which seek to avoid the "disastrous consequences" of the Landlord's success in the instant Motion: (1) The Debtor's actions reflected an implicit assumption of the Lease; (2) the Landlord waived its rights under § 365(d)(4); and (3) the Landlord must be estopped from enforcing § 365(d)(4) against it.

We are very reluctant to accept the first argument. In *In re University Medical Center*, 93 B.R. 412, 415 (Bankr.E.D.Pa. 1988), *aff'd in part & remanded in part on other grounds sub nom. University Medical Center v. Sullivan*, 122 B.R. 919 (E.D.Pa.1990), *reconsideration denied*, 125 B.R. 121 (E.D.Pa.1991), we stated that

> not only must the debtor *present* a formal motion to the court to render such an arrangement valid, but this court must also *act* affirmatively upon it before an assumption of an executory contract or any post-petition agreement to pay a pre-petition obligation is binding upon a debtor.

This passage is more strongly stated than, but is consistent with, our prior decisions holding that an "implicit assumption" of an executory contract will not be recognized. *See In re St. Mary Hospital*, 89 B.R. 503, 507 (Bankr.E.D.Pa.1988); and *In re Metro Transportation Co.*, 87 B.R. 338, 342 (Bankr.E.D.Pa.1988). *Accord, e.g., In re Ho's Ltd.*, 82 B.R. 342, 344 (Bankr.M.D.Pa. 1988); and *In re 1 Potato 2, Inc.*, 58 B.R. 752, 754 (Bankr.D.Minn.1986).

**6.** We note that counsel in *Tulio*, in which our Opinion was published on June 8, 1990, prior to the filing of this case, was the same as counsel for the Debtor in this case. We are dismayed to

However, the course of events here requires us to consider the issues of waiver and estoppel very carefully. With respect to waiver of rights generally, the Third Circuit Court of Appeals has stated that

> " '[w]aiver' is a vague term used for a great variety of purposes, good and bad, in the law. In any normal sense, however, it connotes some kind of voluntary knowing relinquishment of right[,]" *Green v. United States*, 355 U.S. 184, 191, 78 S.Ct. 221, 226, 2 L.Ed.2d 199 (1957) ...,

*Coventry v. United States Steel Corp.*, 856 F.2d 514, 521 (3d Cir.1988), and that

> rights and privileges ... may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equity and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and had engaged in other contract negotiations.

*Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir.1988). *See also, e.g., Fuentes v. Shevin*, 407 U.S. 67, 95, 92 S.Ct. 1983, 2001–02, 32 L.Ed.2d 556 (1972); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); and *In re Souders*, 75 B.R. 427, 435 (Bankr.E.D.Pa.1987).

We recently stated the following regarding the elements of equitable estoppel, which is the type of estoppel in issue here, in *In re Webb*, 99 B.R. 283, 290 (Bankr.E.D. Pa.1989):

> The most comprehensive statement that we could find regarding the elements of equitable estoppel is the following, appearing at 28 AM.JUR.2d, *supra*, at 640–41 [ (1966) ]:

note that counsel for the Debtor has repeated the error which we would have thought that the *Tulio* decision had taught her the lesson *not to* repeat.

"Broadly speaking, the essential elements of an equitable estoppel or estoppel in pais, as related to the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; and (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice (footnotes omitted.)"

See also, e.g., Heckler v. Community Health Services of Crawford County, [Inc.,] 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); United States v. Asmar, 827 F.2d 907, 912 (3d Cir.1987); Santos v. Franklin, 493 F.Supp. 847, 853 (E.D.Pa.1980); GAF Corp. v. Amchem Products, Inc., 399 F.Supp. 647, 657–59 (E.D.Pa.1975), rev'd on other grounds, 570 F.2d 457 (3d Cir. 1978); [In re] Franks, supra, 95 B.R. [346,] at 353–54 [ (Bankr.E.D.Pa.1989) ]; and 14 P.L.E., supra, at 189–91 [ (1959) ].

We believe that both waiver and estoppel can be successfully invoked by the Debtor here. By agreeing to settle the Motion as of November 21, 1990, on terms which would allow the Debtor to retain the benefits of the Lease, contingent only on a further agreement between the parties as to the amount of rent arrearages owed by the Debtor, the Landlord voluntarily forfeited the right to unconditionally evict the Debtor with which it had been vested by the terms of § 365(d)(4). As this relinquishment of rights was made in the midst of litigation of the Motion, when the Landlord was represented by counsel, there is no question that its actions were both with knowledge of its option not to forfeit these rights, as indicated by the filing of the Motion itself, and with intelligence enhanced by the presence of counsel in advising its actions.

■ The requirements of equitable estoppel are also met. By negotiating with the Debtor regarding terms for assumption of the Lease, conditional only upon a resolution as to the arrearages, and joining in announcing the Motion as settled to this court, the Landlord clearly communicated a willingness to allow the Debtor to assume the Lease. Certainly, the Landlord knew that the Debtor relied upon the accuracy of its implicit agreement to allow the Debtor to assume the Lease in these communications. However, the Landlord apparently knew, and did not inform the Debtor, that, if negotiations over the measure of arrearages were unsuccessful, it would again attempt to have the Lease declared terminated by effect of § 365(d)(4).

On its part, the Debtor had no apparent reason to know that the Landlord would withdraw its intention to allow it to belatedly assume the Lease if negotiations over the amount of the arrearages were unsuccessful. The Debtor, in good faith, relied upon the Landlord's intentions to allow it to assume the Lease. And, most importantly, the Debtor engaged in several actions which constituted substantial changes of position, in reliance upon the Landlord's intention to allow it to assume the Lease, to its injury, detriment, and/or prejudice. Not only did the Debtor continue to remit rent to the Landlord at all times, but it committed itself to a substantial loan obligation to renovate the Premises. Only after the loan was made, without objection by the Landlord despite notice to it, and the proceeds of the loan were, as planned, invested in the betterment of the Premises, has the Landlord came forward to seek to disavow its commitment to allow the Debt-

or to assume the Lease. The factor of change of the Debtor's position to its detriment is therefore very strong in the instant factual situation and is decisive in our finding that estoppel also must run against the Landlord.

As we stated in *Tulio, supra,* 115 B.R. at 77,

> we acknowledge the presence of a body of cases holding that a landlord may waive the protection of his interests set forth in § 365(d)(4) by conduct inconsistent with rejection of a lease. *See, e.g., In re Ranch House of Orange–Brevard, Inc.,* 773 F.2d 1166, 1168–69 (11th Cir. 1985); *In re Austin,* 102 B.R. 897, 900–01 (Bankr.S.D.Ga.1989); *In re THW Enterprises, Inc.,* 89 B.R. 351, 355–57 (Bankr.S.D.N.Y.1988); and *In re T.F.P. Resources, Inc.,* 56 B.R. 112, 114–16 (Bankr.S.D.N.Y.1985).

■ We believe that the Landlord's mere acceptance of rent after the 60–day period, without more, would not trigger the successful invocation of either waiver or estoppel against it. *See In re Fosko Markets, Inc.,* 74 B.R. 384, 388–90 (Bankr.S.D.N.Y. 1987). *But see Austin, supra;* and *T.F.P. Resources, supra,* 56 B.R. at 116. As was stated at *id.,* resolution of the issues of waiver and estoppel are fact-intensive, and acceptance of payments, only when in tandem with other facts, is likely to constitute a waiver. *See THW Enterprises, supra,* 89 B.R. at 356.

However, here, the Landlord's expression of a willingness to allow the Debtor to belatedly assume the Lease, causing the Debtor to, in turn, make a loan to effect substantial renovations to the premises, is conduct which supports a conclusion of waiver even more strongly than (1) acceptance of rent, as was in issue in *Austin, supra; THW Enterprises, supra* (acceptance of rent for 14–month period); and

*T.F.P. Resources, supra;* (2) clear statements of the landlord of intention to allow assumption, as was in issue in *In re J. Woodson Hays, Inc.,* 69 B.R. 303, 305–06 (Bankr.M.D.Fla.1987); and *In re Haute Cuisine, Inc.,* 57 B.R. 200, 202–03 (Bankr. M.D.Fla.1986); or (3) a refusal to provide information necessary to accurately compute rent under the lease, as was at issue in *In re Pier 5 Management Co.,* 83 B.R. 392, 394 (Bankr.E.D.Va.1988). The element of inducing the Debtor to make expensive and substantial repairs to the premises in reliance upon its assumption of the Lease, is, if anything, stronger than facts which give rise to estoppel in *Haute Cuisine,* 57 B.R. at 203–04 (assurance by landlord that agreement for assumption would be worked out). Had the Landlord proceeded with the hearing on the Motion on November 21, 1990, the result may well have been different. However, its very expression of a willingness to allow the Debtor to assume the Lease, on that date, significantly changed the complexion of the facts.

■ Certainly, this is not a case where the only equitable element in favor of the Debtor was its and its counsel's lack of awareness of the significance of § 365(d)(4), as was deemed inefficient to constitute grounds to ignore the dictates of § 365(d)(4) in *Boston Business Machines, supra,* 87 B.R. at 872. That lack of awareness apparently existed, despite our *Tulio* decision. But many more facts in favor of the Debtor are in evidence here.[7]

Therefore, we will not hesitate to deny that aspect of the Motion before us seeking to deem the Lease rejected. The Debtor's consistent post-petition payments of what is arguably the correct rental due under the Lease is performance which we find to be adequate to protect the Landlord's interest pending disposition of the issue of the

---

7. We also note that, in *Boston Business Machines,* while rejecting the Debtor's contention that we could allow a § 365(d)(4) motion to simply be granted *nunc pro tunc, id.* at 872–73, we ultimately entered an Order which provided considerable suasion to the landlord to agree to allow the debtor to belatedly assume its lease. *Id.* at 873–74. Not surprisingly, the landlord in that case did ultimately allow the debtor to assume the lease.

terms of the formal assumption of the Lease by the Debtor.

However, this disposition clearly does not resolve all of the disputes between these parties necessary for the Debtor to accomplish the crucial end of assuming the lease in issue under § 365(b)(1)(A). We urge the parties to resolve the issue of the terms upon which the Debtor may assume the Lease promptly, prior to the confirmation hearing, at which resolution of this issue must transpire if a plan is to be confirmed. We further urge the Debtor to file a motion to attempt to resolve that issue prior to confirmation. We have given several indications in this Opinion of our preliminary responses to what appear to be disputed issues to assist that process. However, no final decisions relevant to the § 365(b)(1)(A) issues could or is made herein. The Debtor's failure to successfully prosecute a § 365(b)(1) motion could easily as yet cause its undoing.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 20th day of March, 1991, after a hearing of March 13, 1991, on the Motion of Olde Sproul Shopping Village to Show Cause Why the Debtor's Lease Should Not Be Deemed Rejected, or, in the Alternative, for Adequate Protection of Lease Premises, it is hereby

ORDERED AND DECREED that the Motion is DENIED.